IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

- - -

THE UNITED STATES OF AMERICA,  : 9:  23-cr-00396
                                          :
                                          : September 21, 2023
     versus                       :
                                          : (Pages 1 - 39)
                                          :
RICHARD ALEXANDER MURDAUGH,   :
                                          :
           Defendant.   :
                                          :

- - -
TRANSCRIPT OF PLEA
BEFORE THE HONORABLE RICHARD M. GERGEL
UNITED STATES DISTRICT COURT JUDGE
- - -

**A P P E A R A N C E S:**

For the Government:          EMILY EVANS LIMEHOUSE
                                US Attorneys Office (Chas)
                                151 Meeting Street, Suite 200
                                Charleston, SC 29401-2238

                                KATHLEEN MICHELLE STOUGHTON
                                WINSTON D. HOLLIDAY
                                US Attorneys Office (Cola)
                                1441 Main Street, Suite 500
                                Columbia, SC 29201

For the Defendant:           JAMES MIXON GRIFFIN
                                Griffin Humphries LLC
                                PO Box 999
                                Columbia, SC 29202

                                PHILLIP DONALD BARBER
                                RICHARD A. HARPOOTLIAN
                                Richard A Harpootlian PA
                                1410 Laurel Street
                                Columbia, SC 29201

Court Reporter:                LISA D. SMITH, RPR, CRR
                               Official Court Reporter
                               P.O. Box 835
                               Charleston, SC 29401




        Proceedings recorded by mechanical stenography,
transcript produced by computer.

*(The following proceedings commenced at 10:00 a.m.)*

THE COURT: Good morning. Please be seated.

Good morning, Ms. Limehouse. The government ready to call its next case?

MS. LIMEHOUSE: We are, your Honor. May it please the Court. Emily Limehouse, Katie Stoughton and Winston Holliday, on behalf of the United States.

We are here in the matter of the United States vs. Richard Alexander Murdaugh; Criminal Docket No. 9: 23-396. Mr. Murdaugh is here today, represented by his counsel, Mr. Jim Griffin, Mr. Dick Harpootlian, and Mr. Phil Barber. And we're here for a change of plea hearing.

THE COURT: Very good. Who will be speaking for the defendant?

MR. GRIFFIN: I will, your Honor.

THE COURT: Mr. Griffin, good morning, sir.

MR. GRIFFIN: Good morning.

THE COURT: I want to confirm that your client wishes to change his plea from a plea of not guilty to a plea of guilty today, pursuant to a plea agreement. Is that correct?

MR. GRIFFIN: That is correct.

THE COURT: Ms. Perry, swear the defendant, please.

*(Defendant sworn.)*

THE COURT: Mr. Murdaugh, good morning, sir.

THE DEFENDANT: Good morning, sir.

THE COURT: I want to confirm you wish to change your plea today from a plea of not guilty to a plea of guilty, pursuant to a plea agreement. Is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: Very good. Mr. Griffin, would you approach Ms. Perry. She's going to hand you the plea agreement. I want Mr. Murdaugh to confirm that is his signature on the plea agreement.

THE DEFENDANT: Yes, sir.

THE COURT: Mr. Murdaugh, before I can accept your guilty plea, I need to be satisfied that you understand the charges against you, that you understand the consequences of your plea, and that there's a factual basis to support your plea of guilty. I'm going to ask you a series of questions. If I ask you a question you do not understand, would you ask me to repeat it?

THE DEFENDANT: Yes, sir.

THE COURT: And if I ask you a question in which you would like to consult with your counsel, if you'll let me know that, I will give you an opportunity to privately confer with them, okay?

THE DEFENDANT: Thank you, sir.

THE COURT: You just took an oath to tell the truth; correct, sir?

THE DEFENDANT: Yes.

THE COURT: And that obligates you to answer my questions honestly, does it not, sir?

THE DEFENDANT: Yes, sir.

THE COURT: And you understand if you were to fail to answer a question honestly, you could face further prosecution for perjury or making a false statement? Do you understand that, sir?

THE DEFENDANT: Absolutely.

THE COURT: Mr. Murdaugh, how old are you, sir?

THE DEFENDANT: I'm 55.

THE COURT: How far did you go in school?

THE DEFENDANT: I have post-graduate degree, a JD.

THE COURT: Are you currently under the influence of any drug, medication or alcoholic beverage?

THE DEFENDANT: No, sir. I'm proudly clean now for 744 days.

THE COURT: Glad to hear that, sir.

Have you ever been treated for mental illness?

THE DEFENDANT: No, sir.

THE COURT: Have you been treated for addiction to alcohol or narcotic drugs?

THE DEFENDANT: Yes, sir.

THE COURT: Tell me about that.

THE DEFENDANT: Opiate addiction.

THE COURT: And, sir, since you've had that

experience and you had that treatment -- you've reported now that you've been sober for over 700 days -- does that prior history affect your ability to understand the proceeding here today?

THE DEFENDANT: Not at all, sir.

THE COURT: And would you assure me -- if for any reason you didn't understand what we were doing, you would let me know that?

THE DEFENDANT: I would, sir.

THE COURT: Thank you very much.

Mr. Griffin, do you have any doubt as to the defendant's competence to plead?

MR. GRIFFIN: I do not have any doubts, your Honor.

THE COURT: Ms. Limehouse?

MS. LIMEHOUSE: No doubts from the government, your Honor.

THE COURT: The Court finds that the defendant is competent to plead to these charges.

Mr. Murdaugh, have you had an ample opportunity to discuss this case with your attorneys?

THE DEFENDANT: Yes, sir, I have.

THE COURT: Are you satisfied with your attorneys' representation?

THE DEFENDANT: Very much so.

THE COURT: Have your attorneys done everything

you've asked them to do?

THE DEFENDANT: Without question.

THE COURT: Is there anything else you would like them to do before we proceed with your guilty plea this morning?

THE DEFENDANT: No, sir.

THE COURT: My normal protocol here -- and I'll just maintain it -- is to ask you questions as if you are not a former member of the bar. Obviously, you'd be knowledgeable about these, but I want to get it on the record. Let's focus for a moment, if we might, on your legal rights.

Do you understand, under the Constitution and laws of the United States, you have the right to plead not guilty?

THE DEFENDANT: Yes, sir.

THE COURT: And you understand if you were to plead not guilty, you have a right to a trial by jury?

THE DEFENDANT: I do.

THE COURT: If you were to plead not guilty and request a jury trial, you would be afforded a number of significant rights in this courtroom. Among those would be: You would have a right to assistance of counsel at every stage of the criminal proceeding. You would be presumed innocent. The government would have to prove you guilty beyond a reasonable doubt. You would not be required to prove your innocence. The witnesses for the government would have to

testify in your presence, and your counsel would have a right to cross-examine those witnesses and offer other witnesses on your behalf.  While you would have a right to testify, you would also have the constitutional right to silence.  And if you exercised that right, I would instruct the jury that no inference or suggestion of guilt could be drawn from the fact that you had not testified.  You would also have the right to issue subpoenas for the attendance of witnesses or the production of documents.

Now, Mr. Murdaugh, do you understand these rights as I have explained them to you, sir?

THE DEFENDANT:  I do.  Yes, sir.

THE COURT:  Do you understand that if you plead guilty, you have to give up your right to a jury trial and the other rights I have just listed for you, there will be no trial, and I will enter a judgment of guilty and sentence you on the basis of your guilty plea?  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  Do you understand that if you plead guilty, you also have to give up your right not to incriminate yourself, since I need to ask you questions to satisfy myself that there is a sufficient factual basis for your guilty plea, and you will have to acknowledge to me your guilt; do you understand that, sir?

THE DEFENDANT:  Yes, sir.

9

THE COURT: Do you understand if you plead guilty, you may be required to make restitution to the victims of your acts, either by the payment of money or in personal services, as may be directed by this Court?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand that if you plead guilty, I can order you to forfeit certain property to the government?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand that if you plead guilty, I am obligated to impose a special assessment upon you at $100 per count. And I believe there are 22 counts. So, it would be $2200. Do you understand that, sir?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand that since the offense you're pleading is a felony conviction, that if your plea is accepted, you may be deprived of valuable civil rights, such as the right to vote, hold public office, serve on a jury or possess a firearm of any type? Do you understand that, sir?

THE DEFENDANT: I do. Yes, sir.

THE COURT: Now that I've discussed your rights with you, Mr. Murdaugh, do you still wish to plead guilty?

THE DEFENDANT: I do. Yes, sir.

THE COURT: Have you received a copy of the indictment, which contains the written charges against you,

sir?

THE DEFENDANT: I know the written charges against me, your Honor. Whether or not I've received the indictment or not, I'm aware of them and understand them. And I believe I have received a copy of the indictment.

THE COURT: Okay. If you would like to take a moment just to look at it to make sure that the written indictment is in conformance with your understanding -- could you just take a minute, sir, and look through it?

MR. GRIFFIN: Your Honor, he has received a copy in the prison. I've gone over it with him. But he's had a difficult time maintaining documents at the prison.

THE COURT: So, you're satisfied, Mr. Murdaugh, you have actually received the indictment?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Let me walk through with you the basic charges against you, sir, and what elements the government would have to prove beyond a reasonable doubt to establish your guilt.

Count one is a conspiracy to commit wire and bank fraud. And to satisfy the elements of the conspiracy to commit wire and bank fraud, the government would have to show, first, that from at least July 2011 and continuing at least until October 2021, in the district of South Carolina, you entered into a conspiracy, agreement or understanding to

commit an unlawful act, that is, wire fraud and bank fraud; the second, that at some time during the existence or the life of that conspiracy, agreement or understanding, you knew the unlawful purpose of the agreement; and third, the defendant joined in the agreement willfully with the intent to further the agreement for the unlawful purposes here to commit wire and bank fraud. That is Count 1. And for Count 1, the maximum term of imprisonment is 30 years; the fine is up to $1 million; supervised release, up to five years; and as I mentioned earlier, a special assessment of $100.

Count 2 is bank fraud. Bank fraud, the government must establish as follows: First, that on or about September 13, 2013, and October 28th and 29, 2013, in the district of South Carolina, you knowingly executed or attempted to execute a scheme or artifice to obtain any of the moneys, funds, assets or other property owned by or under the custody of a financial institution by false or fraudulent pretenses, representations or promises; secondly, you must show that you did those acts with the intent to defraud; and finally, that the financial institution was then federally insured. Count 2 has a maximum term of imprisonment up to 30 years, a fine of $1 million, supervised release for five years, and special assessment of $100.

Counts 3 through 7 contain charges of wire fraud. To establish a violation of these counts, 3 through 7, the

federal statutes of wire fraud, the government must demonstrate beyond a reasonable doubt that the defendant devised or intended to devise a scheme to defraud over obtaining money or property by means of false or fraudulent pretenses, representations or promises that were material; and secondly, that the purpose of executing the scheme, the defendant transmitted, or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures or sounds on the date specified in the information. Actually, it would be in the indictment -- is it --

MS. LIMEHOUSE: That's correct, Your Honor.

THE COURT: Should be in the indictment, not an information.

MS. LIMEHOUSE: Yes, your Honor.

THE COURT: The penalty for these offenses, for Counts 3 and 4, wire fraud affecting a financial institution, a maximum term of imprisonment is up to 30 years, a fine of up to $1 million, supervised release for five years, and special assessment of $100.

For Counts 5 through 7, a maximum term of imprisonment is 20 years, a fine up to $250,000, supervised release for three years, and a special assessment for $100.

Count 8 is conspiracy to commit wire fraud. And the government, to establish your guilt, must prove beyond a

reasonable doubt, first, that from and around February 2018 and continuing until at least October 2020, in the District of South Carolina, that the defendant entered into a conspiracy agreement or understanding to commit an unlawful act, that is, wire fraud; secondly, that at some time during the existence or life of the conspiracy, agreement or understanding, the defendant knew the unlawful purpose of the agreement; and finally, third, that the defendant joined in the agreement willfully with the intent to further the agreement for the unlawful purpose here to commit wire fraud.  The maximum term of imprisonment for this offense, Count 8, is 20 years, a fine up to $250,000, supervised release for three years, and a special assessment of $100.

Counts 9 through 22, each contain a count of money laundering.  For the government to establish your guilt on each of these counts, the following elements would have to be satisfied:  First, that on or about the date specified in the indictment, in the District of South Carolina, the defendant conducted or attempted to conduct a financial transaction, having at least a minimal effect on interstate commerce or involving the use of a financial institution, which is engaged in or the activities of which have been at least minimal effect on interstate or foreign commerce; secondly, that the property that was the subject of the transaction involved the proceeds of specified unlawful activity; third, that the

defendant knew that the property involved represented the proceeds of some form of unlawful activity; and fourth, that the defendant knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of unlawful activity.

For Counts 9 through 22, for each count, a maximum term of imprisonment is 20 years; a fine up to $500,000, or twice the value of the property involved in the transaction, whichever is greater; supervised release for up to three years; and a special assessment of $100.

Now, Mr. Murdaugh, do you feel like you understand the charges against you, sir, and the basic elements the government would have to establish to prove your guilt?

THE DEFENDANT: Yes, sir.

THE COURT: I do find the defendant comprehends and understands the nature of the charges against him and generally what elements the government would have to prove if a trial were held.

Now, Mr. Murdaugh, if you plead guilty, or if you were to go to trial and be tried by a jury, it becomes my responsibility to impose an appropriate sentence. In determining that appropriate sentence, I must consider various federal statutes in the sentencing guidelines of the United States Sentencing Commission.

Have you and your attorneys had a chance to discuss those federal statutes and sentencing guidelines and how they may affect your sentence?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand that I will not be sentencing you here today, we will have a later sentencing hearing following the preparation of a presentence report? Do you understand that, sir?

THE DEFENDANT: I do.

THE COURT: Do you understand the sentence imposed by this Court may be different from any estimate your attorneys may have provided you? Do you understand that, sir?

THE DEFENDANT: I do.

THE COURT: And do you understand if the sentence is more severe than you expected, you will not have a right to withdraw your guilty plea; do you understand that, sir?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand under some circumstances, you or the government may have a right to file an appeal on a sentence I impose? Do you understand that, sir?

THE DEFENDANT: Yes, sir.

THE COURT: Now, you, as part of your plea agreement, have agreed to waive partially your appeal rights. I think that's why you were hesitating. And when we go through your

plea agreement in just a moment, I will highlight that particular provision, because I want to make it clear you're totally waiving your appeal rights, you're only partially waiving those rights.

Now, following any period of incarceration in federal court, we have what is called supervised release. And under supervised release, a defendant is required to maintain certain standards of behavior. And if he fails to maintain those standards of behavior, he can be sent back to prison. Do you understand that, sir?

THE DEFENDANT: Yes, sir.

THE COURT: Now, Mr. Murdaugh, are you pleading guilty of your own free will because you are guilty?

THE DEFENDANT: I'm pleading guilty of my own free will because I am guilty and for several other reasons.

THE COURT: Well, what are those other reasons?

THE DEFENDANT: I want to take responsibility. I want my son to see me take responsibility. It's my hopes that by taking responsibility, that the people I've hurt can begin to heal.

THE COURT: Mr. Murdaugh, has anyone threatened you or forced you in any way to plead guilty?

THE DEFENDANT: No, sir.

THE COURT: Has anyone promised you a specific jail sentence?

THE DEFENDANT:  No, sir.

THE COURT:  I'm now going to ask the assistant United States attorney to summarize the provisions of the plea agreement.  I want you to listen carefully, because I'm going to come back to you and I'm going to ask you is that consistent with your understanding of your plea agreement.  So, listen carefully.

Ms. Limehouse?

MS. LIMEHOUSE:  Thank you, your Honor.

Paragraph one of the plea agreement sets forth the counts to which Mr. Murdaugh has agreed to plead guilty, that is, all counts of the pending indictment, Counts 1 through 22.  Paragraph one further sets forth the elements that the government would have to prove to establish his guilt on each of those counts and the corresponding penalties that are implicated by his guilty plea, as your Honor has previously reviewed with him on the record.

Paragraph two of the plea agreement sets forth that the defendant understands and agrees that monetary penalties that will be imposed by this Court are due and payable immediately and subject to the enforcement of the United States as civil judgments.  And in the event the Court imposes a schedule for payment of restitution, he understands that payments made in accordance with installment schedules set by the Court are minimum payments only and do not preclude the

government from seeking to enforce the judgments against other assets of the defendant at any time. The paragraph further sets forth that the defendant agrees to enter into the Bureau of Prisons Inmate Financial Repayment Program, if sentenced to a term of incarceration, with an unsatisfied monetary penalty. He further understands that any monetary penalty imposed is not dischargeable in bankruptcy. And it further outlines the special assessment that is implicated by each count, a hundred dollars for each count of the indictment, and that he is subject also to restitution and fines.

Under paragraph three, the defendant agrees that he understands that the obligations of the government within this plea agreement are expressly contingent upon him abiding by federal and state laws. In the event that he fails to comply with any of the provisions of this agreement, either expressed or implied, the government will have the right, at its sole election, to void all of its obligations under this agreement, and the defendant will not have a right to withdraw his guilty plea.

Paragraph four is a cooperation provision under which the defendant agrees to be fully truthful and forthright with federal, state and local law enforcement agencies by providing full, complete and truthful information about all criminal activities about which he has knowledge. The defendant must provide full, complete and truthful debriefings about these

unlawful activities and must fully disclose and provide truthful information to the government, including any books, papers or other documents or any other items of evidentiary value to the investigation. The defendant also agrees that he must testify fully and truthfully before any grand juries at any trials or other proceedings if the government calls upon him to do so, subject to prosecution for perjury for not testifying truthfully. If the defendant fails to be fully truthful and forthright at any stage, at the government's sole election, the obligations of the government within this agreement will become null and void. Further, it is expressly agreed that if the obligations of the government within this agreement become null and void due to the defendant's lack of truthfulness, the defendant understands that he will not be permitted to withdraw his guilty plea, all additional charges known to the government may be filed against him, the government will argue for a maximum sentence for the offense to which he is pleading guilty, and the government will use any and all information and testimony provided by the defendant, pursuant to this agreement or any prior proffer agreements in the prosecution of the defendant for these charges.

Paragraph five is a polygraph provision under which the defendant agrees to submit to a polygraph examination, as may be requested by the government, and agrees that any such

examinations shall be performed by polygraph examiners selected by the government. The defendant agrees that his refusal to take or failure to pass any such polygraph examination to the government's satisfaction will result at the government's sole discretion, and the obligations of the government within this agreement becoming null and void.

Paragraph six outlines that the government agrees that any self-incriminating information provided by the defendant as a result of his cooperation required by the terms of this agreement, although available to the Court, will not be used against him in determining the applicable guideline range for sentencing, pursuant to the United States Sentencing Guidelines. The provisions of this paragraph shall not be applied to restrict any such information that was known to the government prior to the date of this agreement concerning the existence of prior convictions and sentences in a prosecution for perjury or giving a false statement in the event that he breaches any of the terms of this plea agreement, or use to rebut any evidence or arguments offered by or on his behalf at any stage of the criminal prosecution.

Paragraph seven outlines that, provided the defendant cooperates and otherwise complies with all of the conditions of this plea agreement, the attorneys for the government agree to recommend to Court that the sentence imposed on these charges be served concurrent to any state sentence imposed for

the same conduct. The defendant understands that this recommendation would be in lieu of a motion for a downward departure, pursuant to Section 5K1.1 of the United States Sentencing Guidelines.

Paragraph eight is a lengthy paragraph that outlines the government's rights with respect to the defendant's assets, specifically regarding forfeiture. The defendant agrees to voluntarily surrender to, and not contest the forfeiture of, any and all assets and property or portions thereof which are subject to forfeiture, pursuant to any provision of law, including property and the possession or control of the defendant or the defendant's nominees. Specifically, he agrees to voluntarily surrender and not contest the forfeiture of property identified in the document and any forfeiture bill of particulars. There's a paragraph outlining cash proceeds that are subject to a forfeiture money judgment, a sum of money equal to all proceeds the defendant obtained directly or indirectly from the offenses charged in the indictment. And that would be a minimum of approximately $9 million in United States currency and all interests and proceeds traceable thereto. Paragraph eight further outlines the government's rights with respect to the forfeiture agreement and forfeiture provisions outlined in the indictment.

Paragraph nine summarizes the defendant's

relationship with his defense attorney. And he represents to the Court in this paragraph that he has met with his attorney on a sufficient number of occasions and for a sufficient period of time, to discuss his case and receive advice, that he's been truthful with his attorney related to all information about which he is aware pertaining to the case, that they have discussed possible defenses, if any, to the charges in the indictment, including the existence of any exculpatory or favorable evidence or witnesses, discussed his rights to a public trial by jury or by the Court, the right to assistance of counsel, the right to call witnesses on his behalf and compel their attendance at a trial by subpoena, the right to confront and cross-examine the government's witness, the right to testify on his own behalf or remain silent and have no adverse inferences drawn therefrom, and that he, with the advice of counsel, has a waived the relative benefits of a trial by jury or by the Court, versus a plea of guilty, pursuant to this agreement, and has entered this agreement as a matter of his free and voluntary choice and not as a result of pressure or intimidation by any person.

Paragraph 10 is a limited waiver provision under which the defendant acknowledges the rights he has to contest his conviction and/or sentence, including rights under 28 U.S.C. 2255 and 18 U.S.C. 3742. He acknowledges those rights. And in exchange for the concessions made by the government, he

waives the right to contest either his conviction or his sentence in any direct appeal or other post-conviction action, including under 28 U.S.C. 2255. This waiver is limited, however, and does not apply to claims of ineffective assistance of counsel, prosecutorial misconduct, or future changes in the law that might affect his sentence.

THE COURT: Mr. Murdaugh, let me highlight paragraph two. We mentioned that earlier. Every defendant, including one who pleads guilty, has a right to file an appeal or seek post-conviction relief regarding the conviction and/or the sentence. You're partially waiving that right. You're retaining the right to file an appeal relating to prosecutorial misconduct, ineffective assistance of counsel or future changes in the law that affect the lawfulness of your sentence. Otherwise, you are waiving your appeal rights. Do you understand that, sir?

THE DEFENDANT: I do. Yes, sir.

THE COURT: Ms. Limehouse, please continue.

MS. LIMEHOUSE: Thank you, your Honor.

Under paragraph 11, the defendant waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of his case, and that includes rights under the Freedom of Information Act.

Under paragraph 12, the merger provision, the parties hereby agree that this plea agreement contains the entire agreement of the parties, that it supersedes all prior promises, representations and statements, that it shall not be binding on the defendant until he tenders his guilty plea here today, and that this agreement may be modified only in writing, signed by all parties, and that any and all other promises, representations and statements that are made prior to, contemporaneous with, or after this agreement are null and void.

THE COURT: Mr. Murdaugh, you've heard the summary provided by the assistant United States attorney of your plea agreement. Is that consistent with your understanding of your plea agreement?

THE DEFENDANT: Yes, sir.

THE COURT: I'm now going to ask the assistant United States attorney to summarize the evidence the government would offer if a trial were held in this case.

Now, Mr. Murdaugh, I want you to listen carefully, because I'm going to come back to you and ask you do you dispute any of those facts, and if you do, which specific facts you dispute. So, listen carefully.

Ms. Limehouse.

MS. LIMEHOUSE: Thank you, your Honor.

As to Count 1, the defendant was a personal injury

attorney at a law firm in Hampton County, South Carolina. As a personal injury attorney, he represented individuals in civil claims following injury, death and other loss. The defendant banked at the Palmetto State Bank in Hampton. And Russell Laffitte served as his prior point of contact and handled nearly all of the defendant's banking needs. The defendant and his law firm were significant customers of Palmetto State Bank. At all times relevant to the indictment, Palmetto State Bank was a federally insured financial institution. Beginning in 2011, the defendant devised a scheme to obtain money belonging to Murdaugh's personal injury clients by means of materially false and fraudulent pretenses, representations and promises, and by making false and misleading statements. The money was owed by and in the care, custody and control of the Palmetto State Bank.

As part of the scheme, the defendant asked Russell Laffitte to serve as personal representative or conservator for the personal injury clients. In exchange, Russell Laffitte received hundreds of thousands of dollars in fees. As part of the scheme, defendant directed law firm employees to make checks payable to Palmetto State Bank. The checks were drawn on the law firm's trust account, identified the personal injury clients on the memo lines of the checks, and corresponded to amounts set forth on disbursement sheets. The defendant then delivered the checks to Russell Laffitte, who

distributed the checks to the defendant's own personal benefit, including to pay off personal loans and for personal expenses and cash withdrawals, knowing that the funds belonged to the personal injury clients.

In furtherance of the conspiracy, the defendant committed the following overt acts: On or about December 21st, 2011, the defendant directed Russell Laffitte to negotiate and distribute checks $309,581.46 and $325,000, knowing that the funds belonged to Hakeem Pinckney and Natasha Thomas.

On or about August 29th, 2012, and continuing through September 4th, 2012, the defendant directed Russell Laffitte to negotiate and distribute a check for $25,245.08, knowing that the funds belonged to Natasha Thomas.

And on or about February 8th, 2013, and March 5th, 2013, the defendant directed Russell Laffitte to negotiate and distribute a $388,687.50 check to repay a private loan to a third party, knowing that the money belonged to the Estate of Donna Badger and/or the Estate's beneficiaries.

As to Count 2, which is a substantive bank fraud count relating to conspiracy as set forth in Count 1, in furtherance of the scheme to obtain money under the custody and control of Palmetto State Bank, as charged in Count 1, on September 13th, 2013, the defendant directed law firm employees to draft a check totalling $50,684.75. Thereafter,

the defendant directed Russell Laffitte to distribute $49,500 to Southern Crane on October 28th, 2013, and the remainder in cash back on October 29th, 2013, knowing that the funds belonged to the Estate of Donna Badger and/or Arthur Badger. At the time, the Palmetto State Bank was federally insured.

Count 3: In furtherance of the scheme to fraudulently obtain money from his clients, on May 12th, 2014, the defendant directed law firm employees to draft a check totalling $50,684.75 to a Bank of America account owned and operated by the defendant. The defendant knew that the money belonged to the Estate Donna Badger and/or Arthur Badger, and he deposited the check into his account on May 13th, 2013.

In Count 4, in furtherance of a scheme to fraudulently obtain money from his clients, on May, the 12th, 2014, he directed law firm employees to draft a check totalling $101,369.49 to a Bank of America account, owned and operated by the defendant. The defendant knew that the money belonged to the Estate of Donna Badger and/or Arthur Badger, and he deposited the check into his account on June 25th, 2014. The transmission of the two checks charged in Counts 3 and 4 affected a financial institution.

As to Counts 5 and 7, which are a separate wire fraud scheme, beginning in September 2005, and continuing until at least September 2021, in the District of South Carolina, the defendant knowingly executed a scheme to obtain money from his

clients and his law firm by false and fraudulent pretenses, representations and promises that were material. As part of the scheme, the defendant routed and redirected clients' settlement funds to enrich himself personally by various ways, including drafting, or directing law firm employees to draft, disbursement sheets to send settlement funds to the Bank of America, accounts owned and controlled by the defendant, without proper disclosure or client or law firm approval; by claiming funds held in the law firm's trust account for purposes of satisfying liens on clients' settlement funds as attorneys' fees and directing the disbursement of said funds for his own benefit; by claiming and collecting attorney's fees on fake or nonexistent annuities; by creating fraudulent expenses that were never incurred on client matters, and directing the disbursement of settlement funds to pay the cited costs, including claimed medical expenses, construction expenses, and airline expenses; by directing other attorneys with whom he was associated on client matters to disburse attorney's fees directly to him, rather than appropriately routing any such fees through the law firm; and lastly, by intercepting insurance proceeds intended for beneficiaries and depositing them directly into his personal account.

In 2015, the defendant opened a bank account at the Bank of America titled "Forge." The defendant was the owner of the account on the signature card and was the only

authorized signer on the account. He opened the bank account as part of a scheme to steal money from his clients at his law firm by transferring settlement funds directly into the Forge account, making it appear that the funds were being transferred into legitimate accounts run by Forge Consulting, LLC. Murdaugh used the fake Forge account to knowingly steal millions of dollars from his personal injury clients and others by means of materially false and fraudulent pretenses, representations and promises. After depositing the checks into his fake Forge account, the defendant made cash withdrawals, transferred the funds to another Bank of America account, paid his credit card, and purchased cashier's checks.

As to Count 5, in furtherance of the scheme, on December 26th, 2018, the defendant knowingly directed law firm employees to draft a check to Forge, the bank account owned and operated by the defendant, totalling $225,073.46. The defendant deposited the check into his Forge account and the defendant knew that the funds belonged to A.H., a personal injury client.

As to Count 6, in furtherance of the scheme, on April, the 9th, 2019, the defendant knowingly directed law firm employees to draft a check to Forge, totalling $112,500. The defendant thereafter deposited the check into his Forge account, knowing that the funds belonged to the Estate of B.G., a personal injury client.

And as to Count 7, in furtherance of the scheme on December 15th, 2020, the defendant knowingly directed law firm employees to draft a check to Forge, totalling $91,857.50. The defendant thereafter deposited the check into his Forge accounted, knowing that the funds belong to the Estate of J.H., a personal injury client.

As to Count 8, the conspiracy with Corey Fleming, in February 2018, the defendant's housekeeper, Gloria Satterfield, died following what the defendant reported as a slip and fall caused by his dogs. Gloria Satterfield was survived by two sons. The defendant recommended that Gloria Satterfield's sons hire Corey Fleming and sue the defendant to collect from his homeowners' policies. The defendant intended to defraud Satterfield's sons and his insurance carriers by devising a scheme to obtain money by means of materially false and fraudulent pretenses, representations and promises. As part of the scheme, the defendant conspired with Corey Fleming to obtain money belonging to Gloria Satterfield's sons. In furtherance of the scheme, the defendant directed Fleming to retain hundreds of thousands of dollars in settlement funds for their own personal benefit, represented as prosecution expenses to the state circuit court. The defendant and Fleming knew that the funds did not belong to them and that there were no legitimate "prosecution expenses." The defendant and Fleming reduced Fleming's attorney's fees from

the fees represented to the circuit court. The defendant knew that he would steal the additional funds and use them for his own personal enrichment. As part of the defendant's scheme, the defendant directed Fleming to draft three separate checks from the settlement funds to his fake Forge account, totalling $3,483,431.95. The defendant thereafter deposited the funds into his fake Forge account, knowing that the funds were intended for the benefit of the Estate of Gloria Satterfield and thereafter, used the funds for personal enrichment. The Estate did not receive any of the settlement funds.

And lastly, your Honor, Counts 9 through 12, these are all money-laundering accounts that relate to the Forge account. As to the deposits into the fake Forge account, on the dates set forth in the indictment, the defendant conducted financial transactions at the Bank of America, a federally insured financial institution, from proceeds of wire fraud. The defendant knew that the funds deposited into the fake Forge account represented proceeds of wire fraud, and the defendant designed the transactions to conceal and disguise the nature, source, ownership and control of the proceeds.

As to Count 9, it's a deposit of $85,000 on August, the 31st, of 2018.

As to Count 10, it's a deposit of $65,000 on October, the 3rd, 2018.

As to Count 11, it's a deposit of $19,500 on

October 19th, 2018.

As to Count 12, a deposit of $225,073.46 on December 26th, 2018.

As to Count 13, the deposit of $403,500 on January, the 9th, of 2019.

As to Count 14, a deposit of $279,850.65 on February, the 27th, of 2019.

As to Count 15, a deposit of $112,500 on April, the 11th, 2019.

As to Count 16, a deposit of $2,961,931.95 on May, the 15th, 2019.

As to Count 17, a deposit of $750,000 on February, the 27th, of 2020.

As to Count 18, a deposit of $118,000 on October 6th, 2020.

As to Count 19, a deposit of $152,866 on November, the 30th, 2020.

As to Count 20, a $91,867.50 deposit on December, the 16th, 2020.

As to Count 21, $125,000 deposit on January, the 29th, 2021.

And as to Count 22, an $83,333.33 deposit on May, the 12th, 2021.

There were dozens of victims of Alex Murdaugh's schemes, many of which vulnerable by age and/or physical or

mental disability. As a lawyer to most of these victims, the defendant held a position of trust. The total loss to these victims was in excess of at least $9 million.

THE COURT: Okay. Mr. Murdaugh, you've heard the summary provided by the assistant United States attorney. Do you dispute any of those facts?

MR. GRIFFIN: Your Honor, there were a few points of clarification.

THE COURT: Well, he needs to speak, Mr. Griffin, rather than you.

Mr. Murdaugh?

THE DEFENDANT: Yes, sir. Like, Mr. Griffin said, there are just a couple of points. Not that I think Ms. Limehouse is necessarily wrong, but there's just some issues my attorney is prepared to clarify.

THE COURT: Well, here is the concern. As much as I admire your attorneys, you're the one pleading guilty, not the attorneys. And I need to make sure that we are not modifying factual statements that then eliminate one of the elements of any of these crimes. If you're telling me you're not able to articulate these, I would be glad to hear from Mr. Griffin, but I'm going to need to come back to you and confirm what he says.

THE DEFENDANT: Your Honor, not to be difficult, but in -- what -- if you are willing, I'd like for you to let Mr.

Griffin address those, and then I'd be happy to answer any questions.

THE COURT: Very good. Mr. Griffin?

MR. GRIFFIN: Your Honor, in Counts 2, 3 and 4, there's reference to taking funds belonging to the Estate of Donna Badger and/or Arthur Badger.

THE COURT: Yes.

MR. GRIFFIN: Mr. Murdaugh believed that he was obtaining funds from Arthur Badger only. And I've spoken about this with Ms. Limehouse. But apparently at the bank, the funds may have come from the estate account. It's immaterial on guilt or innocence because they're both in here, but Mr. Murdaugh wanted to make it clear that he believed the money was being taken from Arthur Badger. It doesn't make it any better, but that's just one fine point of clarification.

THE COURT: Are you asking -- are you suggesting that he wants to be clear he stole from Arthur Badger rather than the Estate of Donna Badger?

MR. GRIFFIN: Yes, your Honor.

THE COURT: I'm okay with that. Okay. What else?

MR. GRIFFIN: And the other point of clarification is Count 8, and that is the conspiracy with regard to Corey Fleming and the Satterfield proceeds. And it's important that this is -- he's pleading to conspiracy, which is the agreement he had with Corey Fleming. I think we agreed, by that

admission, he is not admitting that the underlying insurance claim was valid, because he was taking the position in this court in the civil case that it was a fraudulent insurance claim. And I just wanted to be sure that it's on the record that he's pleading to conspiracy, but it doesn't encompass that he's acknowledging the underlying claim is valid.

THE COURT: So, again, what he's trying to do, he says he conspired to steal the money, but that the way he obtained the money was itself fraudulent?

MR. GRIFFIN: That's correct. But we're not saying Mr. Fleming was aware of that. And so, the scope of the conspiracy with Mr. Fleming was stealing from the Satterfield Estate and the insurance companies.

THE COURT: Ms. Limehouse, is the government satisfied with that?

MS. LIMEHOUSE: Yes, your Honor. He's not charged with insurance fraud. And whether that was a legitimate insurance claim or not is really irrelevant to the conspiracy as charged in Count 8. He's charged with conspiring with Corey Fleming to steal money that Corey Fleming believed belonged to the Satterfield's. So, regardless of the positions he's taken in related civil proceedings, as charged in Count 8, his admission to conspire with Corey Fleming is sufficient for the government's purposes.

THE COURT: I agree, Ms. Limehouse, for the

government's interest in this matter. Of course, I had the gift of having that civil case as well.

MS. LIMEHOUSE: Congratulations.

THE COURT: Mr. Griffin, anything further?

MR. GRIFFIN: Those were the only points of clarification we wanted to put on the record, your Honor.

THE COURT: Okay. Mr. Murdaugh, you've heard the statements made by your attorney, Mr. Griffin.

Do you endorse those statements?

THE DEFENDANT: I agree with both those statements and Ms. Limehouse's statements, your Honor.

THE COURT: Very good. It is the finding of the Court in the case of the United States vs. Richard Alexander Murdaugh, that the defendant is fully competent and capable of entering an informed plea, that the defendant is aware of the nature of the charges and the consequences of the plea, and that the plea of guilty is a knowing and voluntary plea, supported by an independent basis in fact, containing each of the essential elements of the offense. The plea is therefore accepted, and the defendant is now adjudged guilty of the offense.

Mr. Griffin, if you would approach Ms. Perry, she has a guilty plea for Mr. Murdaugh's signature.

Having received the guilty plea, and I've approved the guilty plea, are there further matters at this time to

come before the Court?  From the government?

MS. LIMEHOUSE:  None from the government, your Honor.

THE COURT:  From the defense?

MR. BARBER:  Yes, your Honor.  There is one matter.

THE COURT:  Yes.  Why am I not surprised?

MR. BARBER:  Your Honor, as the Court is aware, there are forfeiture provisions within the indictments in this plea agreement.  And Rule 32.2 anticipates that a preliminary order of forfeiture would issue promptly.  And the defendant simply would ask that that order issue as soon as possible.  Today would be excellent.  But there is, we believe, a risk of anticipation which would be voided by the government immediately taking possession of the assets that are subject to forfeiture.

THE COURT:  What's the government's view?

MS. LIMEHOUSE:  Your Honor, as you're aware, we typically handle these matters at sentencing.  We do have a forfeiture provision in the indictment that provides for both a forfeiture money judgment of all proceeds that we can trace to his crimes, as well as what he's admitted to, at least $9 million in the indictment.  I do think we have some discrepancies and disagreements about the actual loss amount that's attributable to the defendant.  He's admitted at least 9 million.  We believe it's over 10 and a half.  And so, those are matters that we would have to address for your Honor at a

sentencing with respect to the loss amount and the guidelines, the related guidelines.

That Rule 32 that Mr. Barber highlighted for the Court just requires that you enter it sufficiently in advance of sentencing to allow us to provide for any revisions. The government today is not prepared to present what we believe is enough evidence to support the 10.5 loss amount. And so, we would just request additional time to be able to present that amount to the Court.

THE COURT: Well, let me understand this. There is no dispute that it's, at a minimum, $9 million; is that correct?

MS. LIMEHOUSE: That's correct.

THE COURT: And, you know, what I normally do at this stage is do a preliminary order of forfeiture and then we make it final at sentencing. You understand that correctly?

MS. LIMEHOUSE: Yes.

THE COURT: So, why don't we enter the preliminary order of forfeiture of at least $9 million. And we understand that that number may change in the final order, but to at least protect the assets from waste before then.

MS. LIMEHOUSE: We're fine with that, your Honor.

THE COURT: If you'll prepare me an appropriate preliminary order of forfeiture, I'll sign it today.

MS. LIMEHOUSE: Okay. We will. Thank you, your

Honor.

THE COURT: Okay. The motion is granted.

MR. BARBER: Thank you, your Honor.

THE COURT: Anything further from the defense?

MR. GRIFFIN: No, your Honor.

THE COURT: Anything further from the government?

MS. LIMEHOUSE: Nothing from the government.

THE COURT: The hearing is adjourned.

* * * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

s/Lisa D. Smith,                              9/21/2023

Lisa D. Smith, RPR, CRR                          Date